**Donald TRUEHART, Personal Representative as Administrator of the Estate of Victor A. Truehart and His Heirs, Donald Truehart, Joan Robienczak Truehart, Terri A. Truehart, and Thomas J. Truehart**

v.

**Peter C. BLANDON, J. Robert Lee III, the M/V Buccaneer, Her Engines, etc., in rem, United States Fidelity and Guaranty Company, the North River Insurance Company, and United States Fire Insurance Company.**

Civ. A. No. 87–0708.

United States District Court,
E.D. Louisiana.

Sept. 28, 1988.

Nunc Pro Tunc Sept. 16, 1988.

See also 685 F.Supp. 956.

John R. Martzell, Martzell, Thomas & Bickford, New Orleans, La., for plaintiffs.

Ashton R. O'Dwyer Jr., J. Dwight LeBlanc III, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for defendants Blandon and USF & G.

---

Hugh M. Glenn Jr., J. Franklin H. Jones III, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., for defendants Lee, North River Ins. Co. and U.S. Fire Ins. Co.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

Trial in this matter was held before the Court sitting without a jury on Monday–Tuesday, June 20–21, 1988. Having considered the record, the memoranda and arguments of counsel, the evidence, and the applicable law, the Court rules as follows. To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as Conclusions of Law; to the extent any of the following Conclusions of Law constitute Findings of Fact, they are adopted as such.

This is a wrongful death case under general maritime law. In the middle of trial, plaintiff settled his claim with defendants for $53,000, each side to bear its own costs. The sole remaining issue is allocation of liability among the defendants.

As explained below, the Court finds that both Peter C. Blandon, the vessel owner, and J. Robert Lee III, the vessel operator at the time of the accident, were negligent and at fault for the death of Victor Truehart, a vessel passenger. Between Blandon and Lee, the Court apportions fault 25% to Blandon and 75% to Lee. As for Lee's liability and his costs of defense, USF & G shall pay $3 for every $11 to be paid by North River and U.S. Fire.

### I.

On February 23, 1986, Peter Blandon and seven of his friends spent the day on Lake Pontchartrain and the Tchefuncte River aboard his 41' Hatteras yacht. On the way home in the evening, Blandon turned the helm over to Robert Lee while Blandon went below deck to answer a call of nature. Soon thereafter, the boat struck the Lake Pontchartrain Causeway Bridge and sank. Victor Truehart, who had been on the brow up top on the yacht, died from the accident.

Victor's father, Donald Truehart, has sued the yacht *in rem* as well as Blandon, his insurer (USF & G), Mr. Lee, and his two insurers (North River and U.S. Fire). Lee and his insurers have filed a cross-claim against USF & G for the full amount of their liability, if any, as well as for Lee's costs of defense.

Much of the evidence on the material portions remaining in this case was very unspecific and vague; none of the principal witnesses (Blandon, Lee, or Michael Williams) was wholly reliable or wholly responsive. Details, which would have been helpful to the Court, were often forgotten or missing or conflicting.

### A.

Blandon's yacht is a large vessel. It has a comfortable cabin below, a relatively large deck in back, and an elevated, covered "flying bridge," from which the vessel is operated. Immediately in front of the flying bridge is a small brow of about 2½ feet in depth, and in front of which is more decking.

Prior to the date of the accident, Blandon had, among other things, a "half tower" cover installed on the flying bridge. On this cover were two overhead, white dome lights, which were the only permanent source of ambient light for the flying bridge.

Also prior to the date of the accident, Blandon had installed five panels "Isinglass curtains" on the front and two sides (but not on the rear) of the flying bridge. "Isinglass" is a clear plastic material that is used on most yachts of this kind. Each panel can be rolled up so as not to be in use, or zipped down in place so as to be in use. Like any window surface, the Isinglass would obscure vision to a small degree as compared to the open air. Like the visibility through windows in a car when an inside light is turned on at night, the visibility through the Isinglass is reduced when a dome light is turned on at night. While Lee's counsel argued that the reduced visibility was to a *per se* dangerous level, the Court cannot so find based on the evidence presented at trial.

There was a large compass in front of the helmswheel. Either the compass was not designed to be internally lit for nighttime operation, or on the night of the accident, its internal lighting was not operable.

Below, the helmswheel was a console that pulled out. On the console was a haler (or radio), with an extendable "squeeze-mike" attached to it. This haler evidently was hooked up to speakers on the front deck of the vessel. Behind the driver's seat was another seat, or bench, under or next to which there was a stereo speaker.

Also near the helmswheel was a toggle switch that operated an automatic pilot system, which Blandon had used earlier on the day of the accident to steer from the south drawpass of the Causeway to the Tchefuncte River.

### B.

Blandon inherited the vessel from his uncle in April 1985 and had operated vessels all his life. The vessel was kept at the Lakeshore Marina in New Orleans. Over the years, he had taken the vessel to and from the Tchefuncte River numerous times.

Prior to the date of the accident, Lee had been aboard Blandon's vessel several times and on occasions had operated the vessel. It appears that Lee had had about 6–7 hours of operating experience on Blandon's vessel, of which about 1½–2 hours were unsupervised by Blandon.

Lee had operated the vessel at night and unsupervised once before, on a trip from Eden Isles to New Orleans. On that occasion, he had a mishap; he somehow overheated the vessel engine and/or damaged the vessel's steering.

Prior to the date of the accident, Blandon, Lee, Michael Williams, and Victor Truehart had begun an 11–week boat operation course given by U.S. Power Squadron in New Orleans. By the date of the accident, they had only completed 5 weeks of the course.

### C.

On the date of the accident, everyone on the vessel (Peter Blandon, Robert Lee, Victor Truehart, Michael Williams, Mike Ripoll, John Ard, Charles Kilbourn, and Hal Gwyn) had been drinking and otherwise "having a good time." According to Blandon's own testimony, Blandon had had four or five beers; according to Lee's own testimony, Lee had had three beers. While some of the passengers had been smoking marijuana aboard the vessel that day, the preponderance of the evidence did not establish that either Blandon or Lee had been so smoking that day. Nor did the preponderance of the evidence establish that either Blandon or Lee had been drinking more heavily than they admitted at trial.

After a full day aboard the boat and an afternoon on the Tchefuncte, Blandon and friends turned back toward New Orleans around 6:30 at night.

According to the uniform testimony, the night was clear and relatively warm for February, the moon was full, the wind was inappreciable, and the water was calm.

On the return voyage back to the Lakeshore Marina, Blandon conned the vessel out of the Tchefuncte River into Lake Pontchartrain. Blandon then navigated the vessel from the western side of the Causeway (on which side lies the Tchefuncte River) to the eastern side (on which side lies the Lakeshore Marina) via the north draw under the Causeway. At this point, the dome lights were turned off; the Isinglass curtain in front of the wheel helm was in the down position (i.e., was in use).

After he was somewhere between ⅛ of a mile and one mile from the Causeway, Blandon turned the vessel slightly aport and set a course approximately due south, steering by line of sight to the lights of the Marina. The vessel was cruising at about 17 knots.

At this time, Victor was standing on the brow in front of the flying bridge. Around that same time, Blandon asked Lee, who had been on the deck, to take over the helm so that Blandon could use the restroom.

Lee did not orally express any reluctance to Blandon about taking over the helm. Lee testified at trial, however, that he felt uncomfortable about operating the vessel alone in light of his previous mishap in operating the vessel at night alone.

According to his testimony, Lee asked Blandon what compass heading to use, whereupon Blandon told him just to steer for the marina lights. Because Lee did not question Blandon about this response, because the dome lights were not on at the time Blandon turned the helm over to Lee, and because there was no problem with seeing the city lights at night when the dome lights were off, the Court finds that Lee also saw these city lights. Lee further seems to have asked Blandon at what speed to travel, to which Blandon responded that the present speed was fine.

Before Blandon descended into the cabin, Victor apparently asked Lee and/or Williams, who went onto the flying bridge about this same time, to turn on some music on the front of the boat, as had been done earlier that day. Lee and Williams, however, were not certain how to do this. According to Lee, Lee asked Blandon about the music, but Blandon gave no responsive answer; Blandon did not recall any such question.

It appears that soon after Lee took over the wheel, either he or Williams turned on the dome lights—either to assist in turning on the music or (as explained below) to assist in viewing the compass, or both. Blandon stated he did not notice such, while Lee suggested Blandon did.

The Court finds that Blandon most probably heard these questions and perhaps saw the light turned on, but was in a hurry to rush to the bathroom and thus paid little or no attention to these events because of his immediate quest for the "head."

While Lee may have felt somewhat uncomfortable about operating the helm, he did not devote his whole attention to navigating the vessel and in otherwise looking where he was going. Several times while at the helm, Lee turned around to see if he and Williams could figure out how to turn the music on out front. The two, unfa-miliar with the equipment, thought that Williams would have success if he held the squeeze-mike in front of the stereo speaker.

In this same general time as well, Lee was also busy trying to read the compass—even though, according to his own testimony, Blandon had told him not to use the compass. On cross-examination, Lee admitted that he did not know the proper compass bearing for the marina, even if he had been able to read the compass that night.

Although no one testified to noticing any perceptible turn in the vessel's course, turn the vessel did. Somewhere between 1½–2 minutes and 5–7 minutes after Lee took over the helm, the vessel turned from its generally south direction to a generally west direction and ran straight into the Causeway. Lee had no idea what happened.

Upon the vessel's striking the East Span of the Causeway, the cover on the flying bridge was sheered off, as the vessel passed under this span and then proceeded to run straight into one of the pilings on the West Span. Some time during this whole foray, Victor disappeared, never to be seen or heard again. With a gaping hole now in the bow, the vessel quickly sank.

The remaining seven called for Victor to no avail and boarded the small dinghy on the vessel. The dinghy, however, was missing a plug and was otherwise too small to hold these seven men. The seven thus had to turn the dinghy over and simply hold on, remaining in the water for another 4–5 hours.

Lee testified that he thought he was seeing the moon's reflection on the water, but asserted at trial that this perhaps was merely glare on the Isinglass panels from the dome light. His operating the vessel at night with the light on merely underscored his inexperience as a marine operator. Despite the calm, clear night and the simple directions, Lee should not have been operating the vessel that night.

Blandon's expert suggested that the entire accident was from Lee's inattention, which Blandon could not have foreseen; Lee's expert suggested that the main cause was instead from the obscured vision from the plastic panels. The Court disagrees with both extreme positions.

## II.

This Court has jurisdiction under 28 U.S.C. § 1333(1), venue is proper in this district, and general maritime law applies. *See Truehart v. Blandon,* 672 F.Supp. 929, 935–36 (E.D.La.1987); *USF & G v. Williams,* 676 F.Supp. 123, 125 (E.D.La. 1987).

While there was some suggestion that the automatic pilot had something to do with the accident—that someone perhaps turned it on accidentally—the Court finds that the automatic pilot played absolutely no part in the accident. No one recalled anyone touching the system's toggle switch, and no one felt any sharp turn that would have been experienced had the system been activated without any readjustment to its earlier compass heading. Instead, the sole causes of the crash were the combined negligence of Blandon and Lee.

While plaintiff had suggested that intoxication was a large, if not the largest, factor in the accident, the Court finds that at most, such did not play a part in this accident; the accident was not caused in part by dulled motor responses of Lee (or Blandon), but rather by inattention and imprudence.

Blandon was negligent in letting an obviously inexperienced person take the wheel at night—a novice whose only other nighttime operation had lead to boat damage to Blandon's very own boat; he was more concerned with his own immediate call of nature than with the signals around him that his boat was not being operated safely.

The facts that the weather and water conditions were excellent and that Lee did not orally communicate any reluctance to take over the helm does not relieve Blandon of his own active negligence; these facts merely mitigate Blandon's degree of fault.

Lee was negligent for agreeing to take over the wheel in the light of his inexperience. If he was as uncomfortable as he suggested at trial, he had an affirmative duty to speak up. Just as it is unreasonable for a person with almost no driving experience to drive a car on a highway at night, so too is it unreasonable for a person to operate a vessel with the full knowledge of being inexperienced or simply uneasy about operating the vessel.

Instead of looking where he was going, Lee spent too much of his time looking at what Williams was attempting or down at the compass, which even if lit would have been no help to him since he did not know the proper compass bearing for his destination. Because of his admitted inexperience at operating the vessel, he should have been concentrating more on the simple task he agreed to accept.

While the Court finds that the Isinglass obscured vision to some degree, this Court cannot say that the curtains were in any way defective. Having accepted the helm, Lee should have at least turned the light off and/or reduced speed. His inexperience at operating the vessel does not relieve him of his obligation to take reasonable notice of what any person would see and he as a car driver should have already known—it is considerably safer and easier to operate a vehicle, any kind of vehicle, at night with the inside lights off than it is with them on.

■ Although difficult to quantify the two's respective percentages of fault, the Court must nonetheless still come up with a number. Considering all the evidence, the Court determines that, as between Blandon and Lee,[1] Blandon was 25% at

---

**1.** The Court need not determine the degree, if any, to which Victor was contributorily negligent for standing on the narrow brow, for whatever the allocation of liability as between Blandon and Lee would remain at the same ratio, no matter what percentage of contributory negligence this Court might assign.

fault and Lee was 75% at fault for the wrongful death of Victor Truehart.

### III.

The sole remaining question is one of insurance. At issue is the allocation between USF & G and Lee's two insurers of Lee's liability and costs of defense.

All three policies at issue were in force on the date of the accident and provide coverage to Lee for the accident.

Blandon's policy from USF & G has a $300,000 policy limit for personal injury and names Lee as an additional insured. Coverage D of the policy reads:

**Coverage Provided**—We [USF & G] will pay damages for bodily injury or property damages for which any insured person becomes legally liable because of a yacht accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. Our duty to settle or defend ends when the amount we pay for damages equals the limits of liability for coverage.

The policy's "other insurance" clause reads as follows: "This insurance is in excess over any other valid and collectible insurance."

Lee's homeowner's policy from North River has a $100,000 policy limit for personal injury. Coverage E of the policy reads:

This Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an occurrence. This Company shall have the right and duty, at its own expense, to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, but may make such investigation and settlement of any claim or suit as it deems expedient. This Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of this Company's liabili-

ty has been exhausted by payment of judgments or settlements.

General Condition 7(b) of the policy provides that as for coverage under Coverage E, the insurance "shall be excess insurance over any other valid and collectible insurance available to the Insured."

Lee's umbrella policy from U.S. Fire provides the following coverage:

The Company will pay on behalf of the Insured the ultimate net loss in excess of the Retained Limit which the insured shall become legally obligated to pay as damages because of bodily injury, property damage or personal injury.

The policy also includes a "drop down" provision:

With respect to any occurrence not covered by the underlying policies or insurance described in the Schedule of Underlying Insurance attached or any other underlying insurance available to the insured, but covered by the terms and conditions of this policy except for the amount of the Retained Limit specified in the Declarations, the Company shall:

(a) defend any suit against the insured . . . ;

.    .    .    .    .

(c) pay all expenses incurred by the Company, all costs taxes against the insured in any such suit and all interest accruing after entry of judgment . . . ;

and the amounts so incurred, except settlements of claims and suits, are payable by the Company in addition to the applicable Limit of Liability of this policy.

The insured shall promptly reimburse the Company for any amount of ultimate net loss (except for defense costs) paid on behalf of the insured within the Retained Limit specified in the Declarations.

"Retained Limit," in this instance, means:

the total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance, and the applicable limits of any other underlying insurance available to the insured. . . .

The Schedule of Underlying Insurance explicitly incorporated Lee's homeowner's policy from North River.

As the Court already held in the property damage claims in connection with this accident, this Court is to apply Louisiana state law as "surrogate" general maritime law for resolving these questions of insurance. *USF & G v. Williams*, 676 F.Supp. at 125–26.

As the Court also previously stated, under Louisiana law, courts are to ignore "other insurance" clauses where such clauses in the policies are mutually repugnant and instead are to allocate damages ratably among all insurers. *Id.* at 128 n. 28.

USF & G argues that the policy limits of all three policies should be aggregated so that USF & G pays $3 for every $11 paid by North River and U.S. Fire. Lee's insurers argue that the policy limit from the umbrella policy should not be included in the aggregation, so that USF & G pays $3 for every $1 paid by North River (with U.S. Fire paying nothing).

■ The two cases Lee's insurers cite, *State Farm Mutual Automobile Insurance Co. v. Travelers Insurance Co.*, 184 So.2d 750, 753 (La.App. 3d Cir.) (Tate, J., concurring), *writs denied*, 187 So.2d 439 (La.1966), and *Stansbury v. Hover*, 366 So. 2d 918, 925 (La.App. 1st Cir.1978), do not support their position. In *State Farm*, the majority of the Court rejected the excess/primary distinction; further, the concurrence's dictum, upon which counsel relies, is of little help for identifying whether the instant policies would come even within the concurrence's purview. In *Stansbury*, there is simply no discussion of any "other insurance" clause or even of whether the insurers disputed the trial court's allocation of liability among the three of them on any grounds of excess-versus-primary. While the question is not without doubt, the Court, without further aid from Louisiana state courts, finds that the "other insurance" clauses in the two sets of policies are mutually repugnant. Despite the clear intent as between North River's policy and U.S. Fire's policy, that the latter be an excess as to the former, the same cannot be said as between U.S. Fire's policy and USF & G's policy; despite the differing language, both policies provide in effect that each will be in excess of the other. Accordingly, the Court must allocate the damages and costs among all three policies —expressing no opinion, however, as to how U S. Fire and North River may together allocate their portion between themselves.

Adding the policy limits of $300,000 from USF & G, $100,000 from North River, and $1,000,000 from U.S. Fire, the Court holds that USF & G must pay $3/14$ of Lee's liability under plaintiff's claim, or $8,517.86.

■ USF & G suggests, though without supporting authority or argument, that it owes no costs of defense to Lee because his own insurers did provide him a defense. The Court disagrees and holds that these costs, provided for by Coverage D of USF & G's policy, are payable on the same ratable basis. *Cf. Blanchard v. Rodrigue*, 340 So.2d 1001, 1009 (La.App. 1st Cir.1976) ("Costs are to be paid by the defendants in proportion to their liability for the entire amount of the judgment."), *writs refused*, 341 So.2d 1129–30 (La.1977). That Lee's own two insurance policies may have equally been obligated to provide him a defense does not vitiate USF & G's separate obligation to provide one as well.

### IV.

The Court holds that USF & G shall pay $21,767.82 [2] of plaintiff's claim and that North River and U.S. Fire shall pay the remaining $31,232.14.[3]

**2.**
$$\$21,767.86 = (25\%)(\$53,000) + (3/14)(75\%)(\$53,000)$$
$$= \$13,250 + (3/14)(\$39,750)$$
$$= \$13,250 + \$8517.86$$

**3.**
$$\$31,232.14 = (11/14)(75\%)(\$53,000)$$
$$= (11/14)(\$39,750)$$

Further, the Court holds that USF & G shall pay to Lee, North River, and U.S. Fire ⁹⁄₁₄ of the reasonable costs, expenses, and attorney's fees for defending Lee.

Within 10 calendar days of the entry of this order, both counsel for defendants shall submit (1) a joint stipulation for the amount of reasonable costs, expenses, and attorney's fees for defending Lee and (2) a proposed form of final judgment, agreed to by both counsel as to form; if counsel are unable to so stipulate and agree, counsel for Lee shall submit amounts, together with supporting documentation, to the Court in the form of a contradictory motion to be filed within 14 days of this order.